THE ATCHISON, TOPEKA & SANTA FÉ RAILROAD COMPANY v. JOSEPH BROWN, *as Administrator of the Estate of William Haas, Deceased.*

SPECIAL FINDINGS; *Verdict, When Set Aside.* Where important and material special findings of the jury are without any support in the evidence, and where other findings are contrary to the evidence, and still other findings evasive and inconsistent, and it appears from such findings that the jury either misconceived the import of portions of the testimony, or else did not make fair and impartial answers to the questions of fact submitted, the general verdict cannot stand, although it has been approved by the trial court.

*Error from Lyon District Court.*

ACTION brought against *The Railroad Company* by *Joseph Brown*, as administrator of the estate of William Haas, deceased, who is alleged to have lost his life by reason of the negligence of the defendant. Trial at the March Term, 1884, and verdict against the company for $5,000. The defendant moved for judgment upon the special findings, notwithstanding the general verdict, which motion was overruled. New trial denied, and judgment upon the verdict for plaintiff. The defendant company brings the case here. The opinion states the material facts. (See also *Rld. Co. v. Brown*, 26 Kas. 443; *Brown v. Rld. Co.*, 29 id. 186; *Brown v. Rld. Co.*, 31 id. 1.)

*A. A. Hurd, C. N. Sterry,* and *W. C. Campbell,* for plaintiff in error; *George W. McCrary,* general counsel.

*W. N. Lowe,* and *Scott & Lynn,* for defendant in error.

The opinion of the court was delivered by

HORTON, C. J.: This was an action brought by Joseph Brown, as administrator, to recover damages for the benefit of the next of kin of William Haas, deceased, who is alleged to have lost his life on November 17, 1879, by reason of the negligence of the railroad company while the said William Haas was in the performance of his duties as an employé of the company.    On the day named, Haas was a yard switchman in the employ of the company at its car yard near the city of Emporia, in this state.    He went in between a box car and a flat car upon the railroad, and attempted to make a coupling of the cars; his head was caught between projecting timbers on the flat car and the box car, and so crushed that he immediately died.    This is the fourth time the case has been in this court. (*Railroad Co. v. Brown,* 26 Kas. 443; *Brown v. Railroad Co.,* 29 id. 186; *Brown v. Railroad Co.,* 31 id. 1.)    At the last time the case was tried, the jury returned a verdict against the railroad company for $5,000.    The railroad company, after the jury returned their verdict and special findings, moved the court for judgment upon the special findings, notwithstanding the general verdict.    This motion was overruled, and excepted to.    This is the first error complained of.

When the case was here at our July term for 1883, Mr. Justice VALENTINE, in delivering the opinion of the court, referred to the admitted facts in the case, and the facts claimed to have been established by the parties to the litigation; thereon he commented at length, and declared the law applicable to the case. (31 Kas. 9–17.)    It is said on the part of the railroad company that the theory of plaintiff's case has always been "the having of an uncovered ditch in the railroad company's yard, into which Haas stepped while performing his duty, and of which he had no knowledge or opportunity of

knowledge." The claim is now made that the findings of the jury show that this theory has no foundation whatever, and cannot be asserted to sustain the general verdict.

The findings which the company allege show that Haas did not step into the ditch, are the following:

"Q. Was the step which Haas took which brought him onto the track between the two cars a step into any ditch? A. Not directly.

"Q. After Haas ·stepped in· between the cars did he take any step or steps toward the coming box car, and if so, how many? A. Not any.

"Q. After Haas stepped in between the two cars, did he take any steps toward the flat car, and if so, how many? A. Not any."

We do not think the conclusion contended for by counsel upon these findings is a correct one. We think, from the general verdict and the evidence introduced in the case, on the part of plaintiff below, it may be fairly assumed that when Haas stooped or crouched under the timbers projecting from the flat car, to make the coupling, he went down into the ditch immediately under the end of one of the cars. When the jury answered, "Not directly," they did not expressly negative his stepping or slipping into the ditch. The answer, on the other hand, tends to show that while he did not directly step into the ditch, *he did so indirectly;* that is, that he stepped upon a tie and slipped into the ditch, or stepped upon the surface ground between the ties and slipped into the ditch. That this interpretation should be given to the above findings, is evident from the following additional findings of the jury:

"Q. If there was any ditch which had anything to do with the accident which resulted in the death of Haas, was such ditch in any way concealed from the view of Haas, at the time he walked down to the east end of the flat car and stopped there waiting for the box car, if he had looked in the direction of it? If the jury answer the last question in the affirmative they may state fully in what manner or by what object or objects, or obstruction, if any, such ditch was concealed so that Haas could not have seen it if he had looked in the direction of it at any time when he was walking down to the end of the

flat car, or when he was standing at or by the end of it?   A. There were several ditches there, as the evidence shows, but from the fact that the track being new, it made between every tie look alike, and a place that had been two or three inches deeper could not be easily discovered without careful examination."

The findings, when read together, will fairly bear the interpretation given, and it is the rule that, where the findings of a jury are fairly susceptible of two interpretations, that one should be given which supports the general verdict, rather than an interpretation which would overthrow and destroy it. (*Railway Co. v. Ritz*, ante, p. 404.)   We perceive no error in the refusal of the court to enter judgment upon the special findings in favor of the railroad company.

It is the further contention, that some of the findings of the jury are without any support in the evidence; that others are contrary to the evidence; and that still others are evasive and inconsistent.   After a careful reading of the record, we think that this attack upon the special findings must be sustained. Our examination satisfies us that the jury were more anxious to answer the special findings in such a way as might not interfere with the general verdict than to give full, fair and truthful answers to the particular questions of fact submitted.   Under such circumstances, the general verdict cannot stand, although it has been approved by the trial court. (*Babcock v. Dieter*, 30 Kas. 172; *Railway Co. v. Fray*, 31 id. 739; *Railroad Co. v. Harvey*, 31 id. 750; *Railroad Co. v. Keeler*, 32 id. 163; *Railway Co. v. Shannon*, ante, p. 446; *Railroad Co. v. Weber, Adm'r*, ante, p. 543; *Railroad Co. v. Wagner*, ante, p. 660.)

A few illustrations of the unsatisfactory answers given by the jury will suffice:

"Q. How much a year would William Haas have contributed to his mother's support, if he had lived until she died? A. On an average, $527.

"Q. The jury may state the facts upon which they base their answer to the last question.   A. On the supposition that he would earn on an average $2.25 per day."

For four years immediately preceding the death of Haas, he

contributed to his mother only $209.20 — at the rate of $52.30 per year. At the time of his death he was earning as wages $1.90 per day — not $2.25 per day. Even if the deceased could have earned $2.25 per day, it is extravagant to say, considering all the evidence in the case, that of his yearly earnings he would have contributed $527 to his mother, who had considerable property of her own, leaving him less than $200 per year with which to support himself.

"The enigma of the future of a life is not to be solved by the mere matter of faith and hope, or even by the natural possibilities of accomplishment; but mainly and chiefly by the experiences of the past and of what the life has already been. The law runs little along the lines of sympathy and affection, but rather along the lines of the actual and the probable." *Railroad Co. v. Brown*, 26 Kas. 460, 461.)

"Q. Did not William Haas voluntarily work in the new yard? A. We don't know."

The evidence established that prior to the employment of the deceased in the car yards he was at work for the company as a brakeman at $1.50 per day; that he left that work to accept employment in the old yard of the company at $1.90 per day, and that he had been at work in the new car yard about eight days prior to his death. It also appears from the findings of the jury that he knew the yard in which he met his death was a new and incomplete yard, continuously undergoing change in the course of its completion; that he knew, at the time of his death, the ground in the yard where he received his injury was wet and muddy, and that the ties upon which the rails were laid on the track were above the surface of the ground. No objection, or protest, or complaint upon his part against working in the new yard appears anywhere in the record. Under these circumstances, it is hardly reasonable to say that the deceased did not voluntarily work in the new yard.

"Q. Prior to the death of Haas, during the time he was at work in the new yard, was it not of frequent occurrence for cars loaded with projecting material to be in that yard? A. No evidence that it was.

"Q. Had not William Haas, prior to the time of his death, coupled and uncoupled cars upon the track upon which he met his death?   A. No evidence that he did."

Upon these matters there is, among other, the following evidence in the record:

Frank J. O'Rourke testified:

"That he was the yardmaster of the Atchison, Topeka & Santa Fé Railroad Company at Emporia at the time that Haas was killed, and knew him as a switchman in the yard of the company; that Haas's duty consisted in catching cars, uncoupling cars and coupling the same; that the persons working in the yard, constituting the entire day force, were himself, one Stafford, John P. Cherry, and Haas, the deceased; that usually the crew had an understanding between themselves that one man, whom they called foreman, pulled the pins; that Stafford did this; that Cherry rode the cars, and Haas coupled; that the south track, upon which Haas was injured, was used at the time for making up the Eureka train once a day; that the Eureka train came in from Eureka in the morning about ten o'clock, and left in the afternoon about four o'clock; that he judged coupling and switching had to be done upon this track at least once a day during the time that Haas was working there; that as he remembered, the Eureka train had to be made up every day on that track, and that Haas was engaged in coupling cars upon the track while working in the yard and in making up the Eureka train; that he did not call to memory any special car or any special day that cars loaded with projecting material passed through, but that they had cars of that kind at all times liable to come through any day, or not to come through for a month; that it was a common thing to receive cars loaded with projecting material; that they were handled the same as other cars were handled—that is, they were uncoupled and coupled, stopped and started, and switched."

S. P. Chase testified:

"That since October 5, 1883, he has been in the music business; that prior to that time he was the foreman and car-repairer for the Atchison, Topeka & Santa Fé Railroad Company at Emporia; that he remembered when the company moved into the new yard at Emporia in the fall of 1879; that the south track, upon which Haas was killed, had been used after the company went into the new yard to make up the Eureka

train on; that it was not unusual to receive cars in the yard at that time loaded with projecting material."

H. B. Morse testified:

"That he knew William Haas in his lifetime, and that he employed him to work in the yard of the Atchison, Topeka & Santa Fé Railroad Company at Emporia; that at the time, the railroad company was building the Eureka branch, the Kansas City & Southern branch, and the McPherson branch; that after the company first moved into the new yard, and up to the time of Haas's death, it was not unusual to receive cars loaded with projecting material in the yard."

William Peck testified:

"That he could not remember the exact date that the company moved into the new yard, but could recollect something near it; that at the time it was not an unusual thing to see cars with projecting material, and that it is not an unusual thing to see flat cars loaded with projecting material on any road; that he hauled in his train cars loaded with projecting timbers into the new yard prior to November 17, 1879, and that he hauled them out with his train; that such cars were going out on the works west, where the company was constructing a new track — the McPherson Branch — and were generally A. T. & S. F. Railroad cars."

C. M. Hatfield testified:

"That he noticed Haas going over to the south track where the cars were to be coupled; that he was at the place where he was killed in about five minutes after he fell; that it was the usual thing to see cars loaded in the yard with projecting material, prior to that time."

Orrin Smith testified:

"That in 1879, he was firing a switch engine in the yard of the Atchison, Topeka & Santa Fé Railroad Company at Emporia; that at the time Haas was killed, he was on an engine used in the new yard of the company; that he was in the new yard about four or five days before Haas's death; that the south track, upon which Haas was killed, was used to make up the Eureka train; that he thought the Eureka train was made up every day on that track during the time he worked there, previous to Haas's death, for three or four days, but that he could not positively swear to that

number of days, but could swear that the Eureka train was made up on the track the last two days — the day Haas was killed, and the day before; that the Eureka train was a mixed train — that is, it was made up of freight and passenger cars; that when the Eureka train came in, the cars that went west were switched out, and the baggage car and passenger car were thrown in on the south track."

On cross-examination, the witness testified as follows:

"Q. Have you any recollection of the Eureka train having been made up in the south yard prior to Haas's death, at any time? A. I think it was made up all the time that I was in the yard right there on that track.

"Q. Didn't you swear at the trial next prior to the last one, that you had no recollection of that train having been made up on that track, except on the night before Haas was killed — the evening before Haas was killed? A. I shouldn't wonder if I did; that is what I say now.

"Q. Then the only time you have any recollection of that train being made up on that track before Haas was killed was the evening before that, was it not? A. It is; if I swore to it before, it is so."

If the jury had said that there was evidence upon these matters before them, but that the evidence was not worthy of belief, or that the witnesses were mistaken, we could at least say that they made intelligent answers; but the answers they did make are evasive.

Again, the following are among several of the inconsistent findings:

"Q. Did not Haas know that the standing car with projecting material was loaded with materials which projected over the east end of it, when he attempted to make the coupling? A. Don't know.

"Q. Did not William Haas stoop or bend his body to avoid the projecting timbers at the time he attempted to couple the cars, at the time of his death? A. Yes."

It is true that there was a mass of questions presented — one hundred and ten — and if we could conclude from the answers that the jury gave intelligent and impartial attention to the testimony and questions submitted, we would not hesitate to overrule the challenges to the answers; but as so many

important and material questions have been improperly, evasively and unsatisfactorily answered, we think it appears therefrom that the jury either misconceived the import of portions of the testimony, or else did not make fair and impartial answers to the questions, and therefore that there has been a mistrial in the case, or a failure of justice. As to the practice controlling the submission of particular questions of fact to a jury, and the construction to be given to the answers thereto, when considered in connection with the general verdict of the jury, we refer to the cases already cited, and also to the following: *Bank v. Peck*, 8 Kas. 660; *City of Wyandotte v. White*, 13 id. 191; *Railway Co. v. Holley*, 30 id. 465.

The judgment of the district court will be reversed, and the cause remanded for a new trial.

All the Justices concurring.