GEORGE FRANCIS *et al.* V. CALISTA J. BROCK.

No. 15,703.

SYLLABUS BY THE COURT.

1. JUDGMENTS—*Special Findings Inconsistent with Each Other and the General Verdict—New Trial.* Where an action for personal injuries is tried to a jury and special findings of fact are returned with the general verdict, and such special findings are inconsistent with each other and with the general verdict, no judgment can·be entered thereon, and a new trial must be granted.

2. PRACTICE, SUPREME COURT—*Excessive Damages—Remittitur —New Trial.* Where, in such a case, the point of inconsistency relates to the amount of damages awarded, and the special findings state several elements of damage and give the amount of each separately, this court, when it appears from such findings that a fair and reasonable amount has been allowed by the jury for all the elements of damage sustained by the plaintiff, may give the plaintiff the option of accepting a judgment for the amount so found or a new trial.

3. —— *Same.* The special findings in this case examined and an option given to the plaintiff to accept a judgment for $2600 or have a new trial.

Error from Montgomery district court; THOMAS J. FLANNELLY, judge. Opinion filed May 8, 1909. Reversed.

STATEMENT.

THIS action was commenced in the district court of Montgomery county by Calista J. Brock to recover damages for injuries sustained on account of her horse becoming frightened and running away, causing her to be thrown from her buggy. The horse was frightened by an automobile owned and operated by the defendants, George Francis and Will Francis. The plaintiff was on the public highway, about one-half of a mile south of Cherryvale, on her way to that city with some farm products for sale. She rode in a one-horse buggy, which was drawn by an ordinarily gentle and well-broken farm horse. The defendants were

coming from the direction of Cherryvale in an automobile. The horse was restive and alarmed when he saw the approaching automobile, and his fright increased as the machine came nearer. The plaintiff turned him out of the road and near to a hedge fence on the side of the highway. The horse, when the automobile was opposite to and near him, crouched between the shafts, jumped and lunged forward, and, as the machine passed, the steam and the hissing sound which accompanied its escape made the horse frantic and unmanageable. He lunged forward and ran away. The buggy struck a telephone pole, and the plaintiff was thrown to the ground and injured. The driver of the automobile did not see the plaintiff, although the public highway was open and unobstructed and he drove his machine along near the middle of the road.

The jury returned special findings of fact with the general verdict which describe the manner in which the parties met and passed, and how the plaintiff's injuries were received. The evidence upon which these findings of fact rest is conflicting, and they may be regarded as conclusive upon the existence of such facts. They are, therefore, here given, omitting those relating to other matters:

*(Special questions submitted by the plaintiff.)*

"(1)  Ques. On the afternoon of May 11, 1904, was the plaintiff, Mrs. Calista J. Brock, driving a one-horse buggy toward Cherryvale?  Ans. Yes.

"(2)  Q. On May 11, 1904, were the defendants, George Francis and William Francis, riding in an automobile going in opposite direction from that Mrs. Brock was driving?  A. Yes.

"(3)  Q. Who owned and was driving the automobile?  A. George Francis.

"(4)  Q. Did Mrs. Brock's horse become frightened at the automobile?  A. Yes.

"(5)  Q. Did Mrs. Brock at the time use care in the management of her horse?  A. Yes.

"(6)  Q. Did Mrs. Brock's horse run away and run against a telephone pole and break loose from the buggy?  A. Yes.

"(7) Q. Was the plaintiff, Mrs. Brock, thrown out of the buggy to the ground at the time the buggy struck the telephone pole? A. Yes.

"(8) Q. Did the defendants stop the automobile at any time while approaching Mrs. Brock and her horse? A. No.

"(9) Q. What, if anything, were the defendants doing at the time they passed Mrs. Brock, if you find that they did pass her? A. They were going directly south.

"(10) Q. Were the defendants, or either of them, watching Mrs. Brock or her horse at the time they were approaching her? A. Yes.

"(11) Q. If you find that they were watching her at the time and just before they passed her, were both of them watching her, or only one? A. Only one.

"(12) Q. If you find that only one of the defendants was watching the plaintiff at and before they passed her, state which one. A. Will Francis.

"(13) Q. Did the horse of the plaintiff act in a nervous and frightened manner before the automobile of the defendant or defendants reached the point of passing the plaintiff? A. Yes.

"(14) Q. If you answer the last question in the affirmative, state whether or not the horse was jumping and plunging just before and at the time the automobile passed. A. Yes.

"(15) Q. Did the defendants, at the time they passed Mrs. Brock, pay any attention to her? A. No."

"(17) Q. Did the defendants stop the automobile after they had passed Mrs. Brock at the time hereinbefore referred to? A. Yes.

"(18). Q. If you answer the last question in the affirmative, state how far they had run after passing Mrs. Brock before such stop was made. A. Two hundred yards.

"(19) Q. Did the plaintiff's horse run away at the moment the automobile passed it? A. Yes.

"(20) Q. What effort, if any, did the defendants, or either of them, make to avoid scaring plaintiff's horse? A. Not any.

"(21) Q. Did the defendants, or either of them, do anything to avoid scaring plaintiff's horse? A. No."

(*Special questions submitted by the defendants.*)

"(1) Q. What distance was the plaintiff from the defendants when plaintiff saw them approaching in the automobile? A. About one-fourth of a mile.

"(2) Q. What distance were the defendants from the plaintiff when she drove her horse to the side of the road and near to the fence? A. About 150 feet.

"(3) Q. What distance is it from the place where the accident occurred to the city of Cherryvale? A. About one-half of a mile."

"(6) Q. Who was in the automobile at the time of the accident? A. George Francis, Will Francis, Harry Francis, Chester Francis, and his little brother.

"(7) Q. Who, if any one, was in the buggy with the plaintiff at the time of the accident? A. Plaintiff's little son."

"(9) Q. Who was the owner of the automobile? A. George Francis.

"(10) Q. Who was operating the automobile at the time of the accident? A. George Francis.

"(11) Q. Was the automobile in question operated by steam? A. Yes.

"(12) Q. How close to the fence was the plaintiff's horse when defendants passed her in the automobile? A. About eight feet.

"(13) Q. If you find that plaintiff sustained any injuries, please state what was the proximate cause of such injuries. A. Carelessness and negligence of defendant in operating automobile."

"(15) Q. Was the defendant Mr. George Francis suffering from an injury or pain in his back on the date of the accident? A. Yes, according to his own evidence."

"(18) Q. What time in the day did the accident occur? A. Between one and two o'clock P. M."

"(28) Q. How much do you allow plaintiff for injury to her head? A. $100.

"(29) Q. How much do you allow plaintiff for injury to her neck? A. $300.

"(30) Q. What internal injuries do you find that plaintiff has sustained? A. Shock of nervous system and injury to spinal column.

"(31) Q. How much do you allow plaintiff for internal injuries? A. $1000.

"(32) Q. How much do you allow plaintiff for pain and suffering? A. $400."

"(36) Q. How much do you allow plaintiff for injury to her left leg? A. $100.

"(37) Q. Was the automobile in which the defendants were riding in plain view of the plaintiff from the

time she first saw the automobile until after such automobile passed her buggy? A. Yes."

"(39) Q. Was the road practically level between the point where the automobile was located and the point where the plaintiff was located with her buggy at the time the plaintiff first saw the automobile approaching? A. Yes."

"(42) Q. Was there a hedge fence along either side of the road at the place where the accident occurred? A. Yes.

"(43) Q. If you answer the last question 'Yes,' please state on which side. A. East side of road."

"(47) Q. How far away from the plaintiff were the defendants at the time of the injury? A. About eighty rods.

"(48) Q. What injury, if any, did the plaintiff sustain to her head? A. Bruises.

"(49) Q. If you state plaintiff's head was injured, state what was the extent of the injury to the plaintiff's head. A. Pain in head.

"(50) Q. What injury, if any, did plaintiff sustain to her left shoulder? A. None.

"(51) Q. What, if any, injury did plaintiff sustain to her right shoulder? A. Severe bruise.

"(52) Q. How much do you allow plaintiff for permanent injury? A. $2000.

"(53) Q. Are either of the lower limbs of the plaintiff permanently injured? A. To some extent."

"(55) Q. How much do you allow the plaintiff for injuries not permanent? A. $100.

"(56) Q. Is this amount included in your general verdict? A. Yes.

"(57) Q. How much do you allow plaintiff for mental suffering? A. $100.

"(58) Q. How fast were the defendants traveling when they passed the plaintiff? A. About ten miles per hour.

"(59) Q. How far did the defendants travel after passing the plaintiff prior to the time the defendant George Francis knew of the accident? A. About 200 yards.

"(60) Q. Was the automobile in which the defendants were riding at the time it passed the plaintiff running in an ordinary manner? A. No.

"(61) Q. If you answer question No. 60 in the negative, then state in what way it was running out of the

ordinary.   A.  They did not give any part of the road,.
neither did they slow up.

"(62)   Q.  Who, if any one, called the attention of·
George Francis to the accident?   A.  Will Francis.

"(63)   Q.  What kind of a machine were the defend-.
ants driving at the time plaintiff claims to have been
injured?   A.  Steam automobile."

"(67)   Q.  When the automobile driven by the de-
fendants passed the plaintiff in the highway, how far
apart were the horse and buggy and the automobile?·
A.  From six to ten feet."

"(72)   Q.  How much do you allow plaintiff for in-
juries to her back up until the present time?   A..
$900."

"(79)   Q.  How much do you allow plaintiff in actual:
damages?   A.  $5000."

"(86)   Q.  Would the stopping of the automobile·
after the horse had become frightened have prevented·
the injury to the plaintiff?   A.  Yes."

"(88)   Q.  How fast were the defendants running at
the time they reached the culvert north of where they·
met the plaintiff?   A.  About three miles per hour.

"(89)   Q.  How fast were defendants running the·
automobile between the culvert and the place where·
they passed the plaintiff?   A.  About ten miles per
hour.

"(90)   Q.  How fast were the defendants running·
when they passed the place where the plaintiff was:
standing?   A.  About ten miles per· hour."

"(93)   Q.  Was the horse and buggy entirely out of·
the traveled portion of the public highway at the time·
the automobile passed such horse and buggy?   A.  Yes.

"(94)   Q.  If you answer the last question 'Yes,' then
please state how far the horse and buggy were out of·
the traveled portion of the public highway?   A.  About.
six or eight feet."

*W. E. Ziegler,* and *J. H. Dana,* for the plaintiffs in
error.

*A. B. Clark,* for the defendant in error.

The opinion of the court was delivered by

GRAVES, J.:  Several questions .have been presented·
by the plaintiffs in error, but in the view we have taken.

one only need be considered. It is insisted that the special findings of fact returned by the jury relating to the amount of damages awarded to the plaintiff are inconsistent with each other and irreconcilable with the general verdict, and therefore will not sustain a judgment for any amount. In our view, this objection is well taken. By the special questions presented to the jury the injuries sustained by the plaintiff were classified as those which were "permanent" and those "not permanent." This classification of course includes all the injuries which she received and all for which she could recover damages. In answer to these questions the jury allowed the plaintiff the sum of $2000 for "permanent" injuries, and the further sum of $100 for injuries "not permanent"; the sum of $2100 was, therefore, the limit of her recovery for all the injuries sustained. The jury, however, returned a general verdict for $5000, being $2900 in excess of the aggregate awarded for injuries "permanent" and those "not permanent." This additional sum of $2900 is shown by the special findings to have been awarded for items of injury which were necessarily included in the amount of $2100 before mentioned. The two amounts, $2100 and $2900, aggregate the amount of the general verdict. It is apparent, therefore, that the damages awarded in the special findings of fact must be duplicated in the amount found by the general verdict.

The injuries to the plaintiff's head, neck, back, leg, and those received internally, while serious enough, perhaps, to merit the award of damages given, were probably not permanent; and had the jury allowed the sum of $3000 for injuries "not permanent" the findings of fact and the general verdict would have been more nearly harmonious. It is impossible to make the findings harmonize or to ascertain from them with certainty what the jury intended. It seems probable, however, that the intention was to award the plaintiff the sum of $5000 in the aggregate, and in distributing

that amount among the various items included in the special questions the importance of the words "permanent" and "not permanent," as applied to the character of the injuries, was overlooked. We can not, however, act upon surmises or probabilities as to what the jury intended. They have spoken, and we are bound by their language.

The purpose of special findings of fact is to ascertain the considerations in detail upon which the general verdict rests, and unless they are consistent and intelligible the verdict can not stand. (*Railway Co. v. Bricker,* 61 Kan. 224; *Kansas City v. Brady,* 53 Kan. 312; *A. T. & S. F. Rld. Co. v. Woodcock,* 42 Kan. 344; *Aultman v. Mickey,* 41 Kan. 348; *A. T. & S. F. Rld. Co. v. Brown,* 33 Kan. 757, 760; *Bank v. Miller,* 59 Kan. 743, 750; *Shoemaker v. St. L. & S. F. Rly. Co.,* 30 Kan. 359.)

It is not surprising that the jury should be misled by the special questions here given; they are well calculated to produce such a result. A jury should not be required to answer questions so formulated that finely drawn distinctions or technical constructions are necessary to a clear understanding of them. Courts should be careful to see that no questions are submitted which can not be easily understood and the purport of the answers to which may not readily be perceived. When necessary, instructions should be given which will fully explain the questions submitted, so that errors and misconceptions may be avoided. We can not criticize the court in this case, as no change or modification of the questions was suggested, nor were explanatory instructions requested. Indeed, there is nothing in the record to indicate that any of the parties connected with the trial anticipated the result which followed. Special questions, when numerous and not carefully prepared, are liable to confuse and mislead a jury, and therefore when they are submitted they should be as direct and clear as possible.

The jury in this case considered the various elements of damages sustained by the plaintiff, and fixed the amount as to each item separately. Perhaps no jury would materially change the aggregate of these amounts. Apparently they were fixed after a fair and dispassionate consideration of the injuries sustained, without regard to their effect upon the final result. While in cases of this character the court will not, upon review, determine the amount of the judgment which ought to be entered, it may, when the several awards named in the special findings show that a fairly reasonable amount has been allowed for all damages sustained, tender to the plaintiff an option to accept judgment for such amount or a new trial. (*Broquet v. Tripp*, 36 Kan. 700.) We have, therefore, concluded to give an opportunity to adjust the controversy in this manner without awarding a new trial absolutely. The jury allowed $2000 damages for the injuries sustained which were permanent, the sum of $100 for those that were not permanent, and for the mental and physical pain the sum of $500; making an aggregate of $2600. We assume that the jury did not regard pain, either mental or physical, the same as an injury like a contusion, sprained ankle or other visible hurt, and, therefore, add the amount allowed for these to the sum of $2100, which amounts, aggregating $2600, constitute the sum to which under the findings of fact the plaintiff is probably entitled. If the plaintiff will consent to accept a judgment for this amount, the court will set aside the present judgment and enter one for that amount upon such consent; otherwise, a new trial will be granted.